# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-3335

_____

United States of America,

*Plaintiff - Appellee,*

v.

Wakinyan Wakan McArthur,

*Defendant - Appellant.*

_____

No. 14-3336

_____

United States of America,

*Plaintiff - Appellee,*

v.

William Earl Morris,

*Defendant - Appellant.*

_____

No. 14-3367

_____

United States of America,

*Plaintiff - Appellee,*

v.

Anthony Francis Cree,

*Defendant - Appellant*.

_____

Appeals from United States District Court
for the District of Minnesota - St. Paul

_____

Submitted: May 18, 2016
Filed: September 8, 2016

_____

Before RILEY, Chief Judge, COLLOTON and KELLY, Circuit Judges.

_____

COLLOTON, Circuit Judge.

A jury convicted Anthony Cree, William Morris, and Wakinyan McArthur of criminal offenses stemming from their involvement with the Native Mob, a Minnesota prison and street gang. All three appeal and argue that the district court erred as to the sufficiency of the evidence, jury instructions, or sentencing. We affirm in part, reverse in part, and remand for further proceedings.

I.

A.

As each defendant challenges the sufficiency of the evidence in support of his convictions, we recite the facts in the light most favorable to the verdicts. *United*

Appellate Case: 14-3335     Page: 2     Date Filed: 09/08/2016 Entry ID: 4445994

*States v. Paris*, 816 F.3d 1037, 1038-39 (8th Cir. 2016). The Native Mob is a prison and street gang that started in south Minneapolis in the mid-1990s. The Mob developed a large presence in Minnesota and now has over two hundred members in the state. Its members participate in a variety of criminal acts, including sales of controlled substances and assaults on members of rival gangs. Through these activities, Mob members seek to promote the gang's reputation and to protect its members and territory.

In December 2009, McArthur called for a Mob meeting. At the meeting, Mob members elected a new group of leaders in the gang's hierarchical structure. Kenneth Roberts was elected War Chief, and Christopher Wuori was named Cass Lake Representative. Members also agreed to hold monthly statewide meetings.

McArthur served as Chief of the Mob, the top leadership position, from 2010 until 2012. Under McArthur, members had easy access to firearms. Members could request a firearm from another member, or they could retrieve a firearm from one of several Mob associates who stored the weapons. The Mob also placed a premium on retaining firearms. At one meeting, McArthur instructed Mob members to "cherish" firearm ownership and to stop losing Mob weapons.

McArthur and Wuori also increased the Mob's drug trafficking operations. The two men "pooled their money together" to purchase cocaine and divided equally the income derived from their drug sales. Wuori obtained cocaine from suppliers, and then converted the cocaine into crack cocaine. Wuori often completed the conversion process in a residence that he and McArthur shared in Cass Lake, Minnesota. Members frequented the house and assisted McArthur and Wuori in obtaining, packaging, and storing the drugs. McArthur and Wuori sold crack cocaine to several members, who then resold the drugs to individuals throughout Minnesota.

Appellate Case: 14-3335    Page: 3    Date Filed: 09/08/2016 Entry ID: 4445994

During McArthur's term as Chief, he often encouraged members to harm rival gang leaders and others who posed a threat to the gang, urging members to be willing to "go out and shoot-'em up." At one of the Mob's meetings, McArthur told members to attack an enemy of the Mob, instructing one member to shoot at the enemy's residence. McArthur also said that the Mob "need[ed] to whack" the leader of an opposition gang, and that the leader's death "would benefit us all."

Amos LaDuke, a former associate of the Mob, was the victim of a Mob attack. In early 2010, Mob members, including Wuori and Cree, concluded that LaDuke "needed to be whacked." Morris also participated in discussions about LaDuke, and Wuori planned to give Morris a "gun . . . in case he seen Amos somewhere." On March 4, 2010, LaDuke was walking in Cass Lake when a car, owned by Cree, approached. Cree, Morris, and two other people were in the vehicle. Morris got out of the car, carrying a firearm as LaDuke started to run away. Morris fired several rounds toward LaDuke, striking LaDuke three times before a former police officer drove his truck between Morris and LaDuke and ended the encounter. Morris fled the scene; authorities arrested him nearby shortly thereafter. Cree and the others in the car drove away during the shooting, and Cree was apprehended in an unrelated incident later that month.

The Mob also went to great lengths to protect its drug distribution territory. Of particular concern to the Mob was Lawrence Daniels, a drug dealer who competed against the gang for control of the Cass Lake drug trade. Starting in May 2010, Mob members talked about harming Daniels in hopes of removing him from their territory. During one conversation, McArthur and Wuori told Mob members Roberts, Emilio Bunker, Jeremee Kraskey, Cory Oquist, and Pedro Sayers that they wanted to find Daniels and "eliminate him by any means." McArthur and Wuori decided to send members to "get . . . information out" of a known associate of Daniels about Daniels's whereabouts; from that excursion Mob members determined that Daniels was living in Bemidji, Minnesota.

-4-

Shortly after learning Daniels's location, McArthur and other members, including Wuori, Bunker, Kraskey, and Roberts, discussed "going to Bemidji . . . and shooting" Daniels. On August 21, 2010, Wuori drove Bunker, Oquist, and Sayers to Bemidji, where the three men shot into a home where they believed Daniels lived. They realized soon after, however, that Daniels had no connection to the residence. In the presence of McArthur and Roberts, the four members recounted their error. Days later, on August 24, some of the same members made a second attempt on Daniels, shooting at the Raisch residence where Daniels was staying.

The Mob continued to pursue Daniels. At the request of McArthur and Wuori, Mob member Dale Pindegayosh agreed to participate in a home invasion to intimidate Daniels. On March 28, 2011, Pindegayosh and three other members, armed with firearms, broke into the home of Daniels's father-in-law, John Wilke. Approximately two months later, McArthur and Wuori requested that Pindegayosh rob the Wilke home. Pindegayosh opted not to complete the crime, and that was the last evidence concerning Mob activity toward Daniels.

B.

Federal and state authorities began investigating the Native Mob as early as 2004. The investigation expanded after the LaDuke shooting. During the investigation, members-turned-informants wore recording devices to four Mob meetings in 2010 and 2011. Law enforcement officers conducted surveillance of several Mob members and installed GPS devices on vehicles used by members.

In January 2012, a grand jury charged Cree, Morris, McArthur, and others in a multicount indictment. Cree, Morris, and McArthur proceeded to trial. After a six-week trial, which included testimony from victims of Mob attacks, former Mob members, and investigators, a jury convicted the men of several charges. After the

-5-

trial, the district court denied the defendants' motions for judgments of acquittal or, in the alternative, new trials.

Cree was convicted of conspiracy to participate in racketeering activity, *see* 18 U.S.C. § 1962(d), and conspiracy to distribute and possess with intent to distribute controlled substances. *See* 21 U.S.C. §§ 841(a), (b), 846. He also was convicted of four counts related to his involvement in the LaDuke shooting: conspiracy to use and carry firearms during and in relation to a crime of violence, *see* 18 U.S.C. § 924(*o*), attempted murder in aid of racketeering, *see id.* §§ 1959(a)(5), 2, assault with a dangerous weapon in aid of racketeering, *see id.* §§ 1959(a)(3), 2, and use and carrying of a firearm during and in relation to a crime of violence. *See id.* §§ 924(c), 2. The district court sentenced Cree to 292 months' imprisonment.

Morris's convictions stemmed from the LaDuke shooting. He was convicted of attempted murder in aid of racketeering, assault with a dangerous weapon in aid of racketeering, use and carrying of a firearm during and in relation to a crime of violence, and possession of a firearm as a previously convicted felon. *See id.* § 922(g). Over Morris's objection, the district court at sentencing ruled that Morris's three prior Minnesota third-degree burglary convictions constituted "violent felonies" for purposes of the Armed Career Criminal Act. *See id.* § 924(e). Because the court found that Morris had at least three previous convictions for violent felonies, he was subject to a mandatory minimum 180-month sentence and a maximum of life on his conviction for possession of a firearm as a previously convicted felon, Count 6. *See id.* The court sentenced Morris to 360 months' imprisonment on that count and to 420 months' imprisonment total.

McArthur was convicted of conspiracy to participate in racketeering activity, conspiracy to use and carry firearms during and in relation to a crime of violence, conspiracy to distribute and possess with intent to distribute controlled substances, and distribution of a controlled substance. *See* 21 U.S.C. § 841(a), (b); 18 U.S.C. § 2.

-6-

He also was convicted of two counts of use and carrying of a firearm during and in relation to a crime of violence. *See* 18 U.S.C. §§ 924(c), 2. The first § 924(c) conviction, Count 10, was based on McArthur's involvement in the shooting at the Raisch home, and the district court sentenced him to a mandatory 60-month term on that charge. *Id.* § 924(c)(1). The second § 924(c) conviction, Count 11, related to McArthur's role in the Wilke home invasion. The court imposed a mandatory 300-month consecutive sentence for that conviction. *Id.* In total, the district court sentenced McArthur to 516 months' imprisonment.

## II.

### A.

Cree's lone argument on appeal is that the district court erred in denying his motion for judgment of acquittal because the government presented insufficient evidence to sustain his convictions. We review the denial of a motion for judgment of acquittal *de novo*, viewing the evidence in the light most favorable to the verdict. *Paris*, 816 F.3d at 1038-39. We will reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id.*; *see* Fed. R. Crim. P. 29.

Cree first disputes the evidence in support of his conviction for conspiracy to participate in racketeering activity. *See* 18 U.S.C. § 1962(d). The government charged Cree with conspiring to violate 18 U.S.C. § 1962(c), a substantive provision of the Racketeer Influenced and Corrupt Organization ("RICO") Act. Section 1962(c) prohibits "any person . . . associated with any enterprise engaged in . . . interstate . . . commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." To convict Cree under § 1962(d), the government was required to prove, *inter alia*, that a RICO enterprise existed and that Cree agreed that he or a coconspirator would

-7-

engage in a "pattern of racketeering activity." Cree contests the evidence supporting these two findings.

A RICO enterprise includes "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An informal association of individuals constitutes a RICO enterprise when it is "a continuing unit that functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 946, 948 (2009); *see also United States v. Turkette*, 452 U.S. 576, 583 (1981). Thus, an enterprise has "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.

Cree argues that the Mob was not a RICO enterprise. Members, according to Cree, had no shared purpose and were a "loose assembly of acquaintances," committing crimes randomly and in their own interests.

Trial testimony, however, provided ample support for the jury's finding that the Mob constituted a RICO enterprise. The Mob had several purposes: Members worked to promote the Mob, develop its reputation, and protect its territory and members. At one meeting, McArthur reminded those in attendance that "[t]his ain't about me. It ain't about no individual person, man. It's about us all." For nearly two decades, the Mob operated as a coherent unit. Many members joined the Mob as teenagers and were in the gang for several years. The Mob had meetings, colors, signals, and symbols. Both written and unwritten rules governed members' behavior. When a member violated one of the rules, Mob leaders meted out punishment, often in the form of a physical assault at the hands of other members. The Mob also used a hierarchical leadership structure, and when one leader stepped down, another member was selected for the role.

-8-

Sufficient evidence also supported the jury's finding that Cree agreed that he or a coconspirator would engage in a "pattern of racketeering activity." Section 1961(1) labels dozens of federal and state offenses as racketeering activities, including "any act or threat involving murder . . . or dealing in a controlled substance . . . , which is chargeable under State law and punishable by imprisonment for more than one year." A "'pattern of racketeering activity' requires at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

To establish a "pattern of racketeering activity," the government also must prove two constituent elements: that the predicate acts of racketeering are related, and "that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). "Criminal acts are sufficiently related . . . if they had the same or similar purposes, results, participants, victims or methods of commission, or if they were otherwise 'interrelated by distinguishing characteristics' as opposed to being 'isolated events.'" *United States v. Hively*, 437 F.3d 752, 761-62 (8th Cir. 2006) (quoting *H.J. Inc.*, 492 U.S. at 240).

Continuity of racketeering activity, "or its threat, *simpliciter*," is a "temporal concept." *H.J. Inc.*, 492 U.S. at 241-42. One manner of proving continuity is open-ended continuity, which asks whether "the related predicates themselves involve a distinct threat of long-term racketeering activity, either implicit or explicit." *Id.* at 242-43. Open-ended continuity may be established by showing that the racketeering acts "include a specific threat of repetition extending indefinitely into the future." *Id.*

Cree contends that the racketeering activity of which he was convicted, the charges relating to the shooting of LaDuke and drug distribution, were neither related to one another nor sufficient to show a threat of continued criminal activity. On this view, he thus never agreed to participate in a "pattern of racketeering activity."

-9-

Cree's arguments are unpersuasive. Evidence supported the jury's finding that the LaDuke shooting and Cree's drug distribution amounted to a pattern of racketeering activity. The acts were related, in that Cree, Wuori, and other Mob members participated in both crimes, and the acts represented a consistent desire to further the Mob's activities. *See United States v. Darden*, 70 F.3d 1507, 1525 (8th Cir. 1995). Because these two acts "by their very nature threaten repetition," the jury also could find open-ended continuity. *Hively*, 437 F.3d at 761. Mob members were known for assaulting competing drug dealers or others believed to pose a threat to the Mob's interests. It is likely that members would, and testimony suggested they did in fact, continue these tactics after the LaDuke shooting and Cree's arrest. *See United States v. Delgado*, 401 F.3d 290, 298 (5th Cir. 2005); *United States v. Diaz*, 176 F.3d 52, 93-94 (2d Cir. 1999). A reasonable jury, therefore, could convict Cree of conspiracy to participate in racketeering activity.

Cree next complains that there was insufficient evidence to convict him of conspiring to distribute and possess with intent to distribute controlled substances. But sufficient evidence supported this conviction as well. Testimony showed that Mob members were engaged in a drug conspiracy and that Cree knowingly participated in the conspiracy. *See United States v. Ramirez*, 350 F.3d 780, 783-85 (8th Cir. 2003). Mob members testified that Cree was present when Wuori cooked crack cocaine, and that Cree received distribution quantities of crack cocaine from Wuori on consignment that Cree then sold in the Cass Lake area. It was for the jury to judge the truthfulness of these witnesses, and witness credibility is virtually unreviewable on appeal. A reasonable jury could convict Cree of the charge based on this evidence.

Cree's last argument is that the evidence did not demonstrate his "complicity" in the LaDuke shooting, a finding necessary for his four convictions relating to that incident. Cree insists that he did not know Morris was going to shoot LaDuke. The record, however, shows that Cree was aware of the impending attack on LaDuke and

Appellate Case: 14-3335     Page: 10     Date Filed: 09/08/2016 Entry ID: 4445994

assisted Morris in completing the crime. Cree discussed harming LaDuke with Morris and other members, and he was present when Wuori agreed to provide a gun to Morris in case Morris encountered LaDuke. And LaDuke testified that about fifteen minutes before the shooting, he twice observed Cree staring at him as Cree and another man drove past his location. It was the jury's prerogative to determine LaDuke's credibility.

Cree's recounting the day of the attack to fellow members further demonstrates his knowing participation in the incident. Cree told members that he had found locations that LaDuke frequented and saw LaDuke "slippin'" (*i.e.*, leaving himself vulnerable to attack) in one such location. Cree then retrieved a firearm and picked up Morris to "take care" of LaDuke. On this record, a reasonable jury could convict Cree of the charges relating to the LaDuke attack, and the district court properly denied Cree's motion for judgment of acquittal.

Cree also argues that the district court should have granted his motion for a new trial because the verdict was against the weight of the evidence. In the district court, however, Cree did not move for a new trial based on the weight of the evidence; as a result, his claim is procedurally barred on appeal, and we need not consider it. *United States v. Flynn*, 196 F.3d 927, 932 (8th Cir. 1999). We thus affirm the judgment of the district court as to Cree.

B.

Morris raises three claims of error. Morris first avers that the district court wrongly denied his motion for judgment of acquittal because there was insufficient evidence to convict him of either attempted murder in aid of racketeering or assault with a dangerous weapon in aid of racketeering. *See* 18 U.S.C. §§ 1959(a), 2. Morris does not dispute the existence of a RICO enterprise engaged in racketeering activity that affected interstate commerce or that he assaulted and attempted to murder

-11-

LaDuke with a firearm. Morris instead alleges that the government did not demonstrate that he attacked LaDuke for a purpose listed in the statute—in this case, to maintain or increase his position in the Mob—because there was not proof beyond a reasonable doubt that he was, in fact, a Mob member. *See id.* § 1959(a).

The evidence was sufficient for the jury to conclude that Morris was a Mob member and that he shot LaDuke to maintain or increase his status in the gang. Morris discussed shooting LaDuke with other members, and some of those members later assisted Morris in carrying out the attack. A former member testified that in 2010, Wuori introduced him to Morris "as if [Morris] was Fam," a term members used to denote membership in the gang. While some members may not have been aware of Morris, witnesses attested that members often did not know everyone in the Mob due to the Mob's large membership. Morris's communications on the day of the shooting and during his subsequent incarceration further support a finding that he was a Mob member. Near the time of the shooting, Morris used a cellular telephone to call a telephone number at which both McArthur and Wuori were known to receive calls. While in prison, Morris contacted several Mob members via telephone and mail, including Cree, McArthur, and Wuori, and represented himself as a member of the Mob. And it is undisputed that members increased their standing in the gang by committing violent crimes. Thus, the jury reasonably decided that Morris attacked LaDuke to maintain or increase his position in the Mob.

Morris next asserts that the jury instructions on the § 1959(a) charges constructively amended the indictment. An indictment is constructively amended when the government or court alters the essential elements of an offense set forth in the indictment. *United States v. Mariano*, 729 F.3d 874, 880 (8th Cir. 2013). The indictment here charged that Morris attacked LaDuke "for the purpose of maintaining and increasing" his position in the Native Mob. Morris complains that the district court's instruction on that element did not match the indictment, because it asked whether Morris assaulted LaDuke "to gain entrance to, or to maintain, or to increase

-12-

his position" in the Mob.  But Morris requested the precise jury instruction used by the district court, and he has therefore waived any claim of error based on an alleged constructive amendment.  *Id.* at 880-82; *Petschl v. United States*, 369 F.2d 769, 774 (8th Cir. 1966).

Morris's last argument is that the district court erred in ruling that his prior third-degree burglary convictions constituted violent felonies under the Armed Career Criminal Act.  Morris was convicted for possession of a firearm as a previously convicted felon.  *See* 18 U.S.C. § 922(g).  This offense carries a maximum sentence of 120 months' imprisonment.  *Id.* § 924(a)(2).  The Armed Career Criminal Act, however, provides for an enhanced sentence of 180 months to life in prison on a § 922(g) conviction, if the defendant "has three previous convictions . . . for a violent felony."  *See id.* § 924(e)(1).  Over Morris's objection, the district court found that Morris had four prior "violent felony" convictions, three of which were for third-degree burglary in Minnesota, and that he was subject to the enhancement.  The court thus imposed a 360-month sentence for Morris's violation of § 922(g).

Morris contends on appeal that the Minnesota third-degree burglary statute, Minn. Stat. Ann. § 609.582, subd. 3, sets forth multiple, alternative versions of the crime, that at least one of the statute's alternatives is not a violent felony, and that the district court should have applied the "modified categorical approach" to determine whether his convictions were violent felonies.  We conclude that Morris is correct.

The Minnesota third-degree burglary statute provides that:

> Whoever enters a building without consent and with intent to steal or commit any felony or gross misdemeanor while in the building, or enters a building without consent and steals or commits a felony or gross misdemeanor while in the building, . . . commits burglary in the third degree and may be sentenced to imprisonment for not more than five years . . . .

-13-

Minn. Stat. Ann. § 609.582, subd. 3. "Enters a building without consent" includes either entering or remaining in a building without the owner's consent. *Id.* § 609.581, subd. 4.

The Armed Career Criminal Act defines "violent felony" to include burglary that is "punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 924(e)(2)(B). To determine whether a prior burglary conviction is a violent felony, we typically apply the "categorical approach." *Mathis v. United States*, 136 S. Ct. 2243, 2247-48 (2016). In that analysis, we compare the elements of the statute under which the defendant was convicted with the "generic" definition of burglary set forth in *Taylor v. United States*, 495 U.S. 575, 598-99 (1990). *See Descamps v. United States*, 133 S. Ct. 2276, 2283 (2013). Only when the statute has the same or narrower elements as the generic crime does the prior conviction count as a violent felony. *Id.* But if the statute is divisible, setting forth "multiple, alternative versions of the crime," and not all of the alternatives satisfy the generic definition, then we apply the "modified categorical approach" to decide which of the alternatives was the basis for the conviction. *Id.* at 2283-86.

Section 609.582, subd. 3, is divisible, so we must consider whether each statutory alternative qualifies as a "violent felony." The government argues that we have ruled already that convictions under either alternative in § 609.582, subd. 3, qualify as violent felonies. But the cases on which the government relies are inapposite. The decision in *United States v. Sonczalla*, 561 F.3d 842, 846 (8th Cir. 2009), concerned an earlier version of the third-degree burglary statute, enacted in 1986, that did not contain the second alternative in the current statute. *See* Minn. Stat. Ann. § 609.582, subd. 3 (1986). *United States v. Constantine*, 674 F.3d 985, 990 (8th Cir. 2012), did hold that § 609.582, subd. 3, "qualifies as a 'violent felony' under 18 U.S.C. § 924(e)(2)(B)(ii)." But *Constantine* cited *Sonczalla*, which involved the 1986 statute and thus addressed only one of the two statutory alternatives. *Constantine* also relied on precedent suggesting that burglary

-14-

convictions qualified as violent felonies under the "residual clause" of § 924(e)(2)(B)(ii), *id.*, but the Supreme Court later declared the residual clause unconstitutional. *Johnson v. United States*, 135 S. Ct. 2551, 2557 (2015). Because *Constantine* did not specify that a conviction under both of the alternatives in the current version of the Minnesota third-degree burglary statute qualified as a generic burglary under *Taylor*, we do not consider it controlling on the question.

The first alternative of § 609.582, subd. 3, forbids "enter[ing] a building without consent and with intent to steal or commit any felony or gross misdemeanor" while inside. *Taylor* defines "generic" burglary as "an unlawful or unprivileged entry into, or remaining in, a building or other structure, with intent to commit a crime." 495 U.S. at 598. Because the first alternative of the Minnesota statute contains all of the elements in the *Taylor* definition, convictions based on that alternative count as violent felonies.

The second alternative of the Minnesota statute provides that "whoever enters a building without consent and steals or commits a felony or gross misdemeanor" while inside commits third-degree burglary. That portion of the statute, however, does not include the element of "intent to commit a crime" at the time of the unlawful entry or remaining. *See State v. Benedict*, No. A13-1324, 2014 WL 2921869, at *2 (Minn. Ct. App. June 30, 2014). Whether the second alternative qualifies as a violent felony thus depends on when, under the definition of generic burglary, an offender must form the intent to commit a crime within the building.

The government contends that the generic definition of burglary is broad enough to encompass the second alternative under § 609.582, subd. 3. *Taylor* said that generic burglary includes "remaining in" a building with intent to commit a crime. 495 U.S. at 598. The government argues that a person convicted under the second alternative for entering a building without consent and then later stealing or committing a felony or gross misdemeanor while in the building meets the "remaining

-15-

in" aspect of *Taylor*'s definition. The offender necessarily has "remained in" the building with intent to commit a crime, the argument goes, because he must have developed the requisite intent at some point while "remaining in" the building.

We reject this reading of *Taylor*. *Taylor* provides that burglary occurs when an offender enters or remains in a building or structure "*with intent* to commit a crime." *Id.* (emphasis added). The most natural reading of *Taylor* and the sources on which it relied show that a generic burglary requires intent to commit a crime at the time of the unlawful or unprivileged entry or the initial "remaining in" without consent. *See* 2 Wayne R. LaFave & Austin W. Scott, Jr., *Substantive Criminal Law* § 8.13(b), (e), at 468, 473-74 & n.101 (1986) (noting that the "intent to commit a crime within need only exist at the time the defendant unlawfully remained within"); *Model Penal Code* § 221.1, cmt. (1), (3) (Am. Law Inst. 1980) (referencing the "purpose that accompanies the entry," and "the purpose that must accompany the intrusion").

The act of "remaining in" a building, for purposes of generic burglary, is not a continuous undertaking. Rather, it is a discrete event that occurs at the moment when a perpetrator, who at one point was lawfully present, exceeds his license and overstays his welcome. *See* LaFave & Scott, *supra*, § 8.13(b), (e), at 467-68 & n.47, 473-75 (distinguishing between burglary statutes that require intent to be contemporaneous with the unlawful entry or remaining and those providing "that actual commission of the offense within is an alternative basis for conviction"). If the defendant does not have the requisite intent at the moment he "remains," then he has not committed the crime of generic burglary. The government's reading of *Taylor* would render the "unlawful entry" element of generic burglary superfluous, because every unlawful entry with intent would become "remaining in" with intent as soon as the perpetrator enters.

-16-

Our understanding of *Taylor*, requiring the existence of "contemporaneous intent," is consistent with the views of the Fifth and Ninth Circuits. *See United States v. Herrera-Montes*, 490 F.3d 390, 392 & n.1 (5th Cir. 2007); *United States v. Bonat*, 106 F.3d 1472, 1475-76 (9th Cir. 1997). A divided panel of the Fourth Circuit reached a contrary conclusion in *United States v. Bonilla*, 687 F.3d 188, 192-94 (4th Cir. 2012). The *Bonilla* panel reasoned that even when a state burglary statute does not require contemporaneous intent, it corresponds "in substance" to *Taylor*'s definition of generic burglary. *Id.* (quotation omitted). A dissenting judge disagreed, concluding that generic burglary as defined by *Taylor* includes a requirement of contemporaneous intent, and that a state statute without that element does not qualify as generic burglary. *Id.* at 196-98 (Traxler, C.J., dissenting). For the reasons discussed, we believe the *Bonilla* dissent, along with the Fifth and Ninth Circuits, has the better view. With respect, we also believe the Fourth Circuit's concern that a requirement of contemporaneous intent is "too rigid," 687 F.3d at 194, is at odds with the exacting standard applied by the Supreme Court in its recent decisions in this area. *See, e.g.*, *Mathis*, 136 S. Ct. at 2251-54, 2257; *id.* at 2270-71 (Alito, J., dissenting); *Descamps*, 133 S. Ct. at 2283-86, 2293.

Because a conviction under the second alternative of § 609.582, subd. 3, does not require that the defendant have formed the "intent to commit a crime" at the time of the nonconsensual entry or remaining in, it does not qualify as a violent felony. Section 609.582, subd. 3, thus includes at least one alternative that does not satisfy *Taylor*. The district court should have applied the modified categorical approach to ascertain which alternative formed the basis of Morris's third-degree burglary convictions and then to decide whether the convictions were violent felonies. *See Descamps*, 133 S. Ct. at 2283-85. Accordingly, we vacate Morris's sentence and remand for further proceedings.

-17-

## C.

### 1.

McArthur raises three claims of error on appeal. All three involve his two convictions for aiding and abetting the use or carrying of a firearm during and in relation to, or the possession of a firearm in furtherance of, a crime of violence. *See* 18 U.S.C. §§ 924(c), 2. He first argues that the district court violated his rights under the Double Jeopardy Clause by imposing consecutive sentences for those convictions, because the convictions arose from one predicate offense, conspiracy to participate in a pattern of racketeering activity. Although our circuit precedent rejects this claim, *see, e.g.*, *Hamberg v. United States*, 675 F.3d 1170, 1172-73 (8th Cir. 2012); *United States v. Lucas*, 932 F.2d 1210, 1222-23 (8th Cir. 1991), the government nonetheless asks us to vacate one of McArthur's convictions based on an internal Justice Department policy to refrain from pursuing multiple § 924(c) charges in this circumstance. The relevant policy provides that each § 924(c) charge in an indictment should be based on a separate predicate offense. *See* Brief for the United States in Opposition to Petition for Writ of Certiorari, *Carter v. United States*, 537 U.S. 1187 (2002), (No. 02-655), 2002 WL 32133544, at *8. The United States Attorney evidently charged McArthur in violation of Department policy and now requests that we vacate one of the § 924(c) convictions so that the government may belatedly comply with the policy.

The Supreme Court addressed a comparable situation in *Rinaldi v. United States*, 434 U.S. 22, 29 (1977) (per curiam), where the government prosecuted a defendant in violation of its *Petite* policy against multiple prosecutions by separate sovereigns for the same act. *See Petite v. United States*, 361 U.S. 529, 530-31 (1960) (per curiam). Although the conviction did not violate the Double Jeopardy Clause, *see Abbate v. United States*, 359 U.S. 187 (1959), the Court held that the district court should have granted the government's belated motion to dismiss the indictment. The

-18-

Court concluded that the "overriding purpose of the *Petite* policy is to protect the individual from any unfairness associated with needless multiple prosecutions," and that the defendant "should receive the benefit of the policy whenever its application is urged by the Government." *Rinaldi*, 434 U.S. at 31. The policy here, although not premised on the "dual sovereignty principle inherent in our federal system," does seek "to protect interests . . . embraced by the Double Jeopardy Clause." *Id.* at 29. The Justice Department has opted, as a matter of policy, to follow the view of other circuits that "the imposition of consecutive sentences under subsection 924(c) for using multiple weapons during a single crime of violence would impinge upon fundamental 'double jeopardy' principles." *United States v. Peña-Lora*, 225 F.3d 17, 32 (1st Cir. 2000); *see* U.S. Dep't of Justice, Office of Legal Education, *Federal Firearms Manual* § 4.25, at 192-93 (3d ed. 2001) (attached as Appendix B to the Brief for the United States in Opposition to Petition for Writ of Certiorari in *Carter*). We see no material distinction between this case and *Rinaldi*, and therefore grant the government's request to vacate McArthur's conviction on Count 11.

McArthur next contends that the jury instructions as to Count 10, the remaining § 924(c) charge, did not comply with *Rosemond v. United States*, 134 S. Ct. 1240 (2014). This charge concerned the shooting at the Raisch residence. A person who "aids, abets, counsels, commands, induces or procures" the commission of a federal offense "is punishable as a principal." 18 U.S.C. § 2. To convict a defendant of aiding and abetting a § 924(c) offense, the government must prove: (1) that a predicate crime of violence or drug trafficking was committed; (2) that a gun was used in a prohibited manner during the predicate offense; (3) that the defendant facilitated the firearm use, the predicate crime, or both; and (4) that the defendant had advance knowledge that one of his confederates would use or carry a gun during and in relation to the commission of the predicate crime, or would possess a gun in furtherance of the predicate offense. *Rosemond*, 134 S. Ct. at 1245, 1247, 1248-51.

-19-

Although the Supreme Court decided *Rosemond* after McArthur's trial, we apply the case retroactively to cases on direct review. *Johnson v. United States*, 520 U.S. 461, 467 (1997). But because McArthur did not object in the district court to the instructions he now challenges, we review only for plain error. *Id.* at 466. To obtain relief, McArthur must show that there was an error that was obvious, rather than subject to reasonable dispute, and that the error affected his substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 466-68; *see Puckett v. United States*, 556 U.S. 129, 135 (2009).

McArthur complains that the district court's instructions for the charges of aiding and abetting a violation of § 924(c) did not require the jury to find that he had advance knowledge that a confederate would use or carry a firearm during the Raisch shooting. The elements instruction for aiding and abetting Count 10 required the jury to find beyond a reasonable doubt that McArthur "must . . . have known that someone was going to knowingly use or carry a firearm during or in relation to, or possess a firearm in furtherance of, the crime of conspiracy to participate in a racketeering enterprise." McArthur argues that the instruction permitted the jury to convict him based on a finding that he had advance knowledge that a coconspirator would use, carry, or possess a firearm at some point during the conspiracy in general, as opposed to advance knowledge that a coconspirator would use, carry, or possess a firearm during the attack on the Raisch home.

The government does not address McArthur's premise that what he refers to as "general" knowledge is insufficient to support a § 924(c) conviction under an aiding and abetting theory of liability. *Rosemond* says that the defendant must know in advance that a confederate will carry a gun during commission of the predicate crime. 134 S. Ct. at 1245, 1249-51. The predicate crime here was conspiracy to participate in racketeering activity, not a substantive offense of shooting at the Raisch home. *See United States v. Hinds*, 435 F. App'x 832, 835-36 (11th Cir. 2011) (per curiam) (upholding a conviction for aiding and abetting possession of firearms in

-20-

furtherance of a drug conspiracy where the defendant provided firearms to his coconspirators for their use in furtherance of the conspiracy); *cf. Pinkerton v. United States*, 328 U.S. 640, 645-48 (1946); *United States v. Bailey*, 235 F.3d 1069, 1074 (8th Cir. 2000). But the government defends the conviction solely on the ground that the jury instructions adequately elicited a finding on whether McArthur had advance knowledge that a confederate would use a firearm in the Raisch shooting. Because we deem that avenue sufficient to sustain the judgment, we need not address whether McArthur's premise is correct.

Assuming, therefore, that *Rosemond* required McArthur to have advance knowledge that a firearm would be used during the Raisch shooting, the jury instructions about which McArthur complains were not plainly erroneous. The jury was instructed that to convict McArthur for aiding and abetting in the commission of Count 10, McArthur "must . . . have known that someone was going to knowingly use and carry a firearm during and in relation to, or possess a firearm in furtherance of, the crime of conspiracy to participate in a racketeering enterprise." The jury knew, however, that Count 10 charged that "on or about August 24, 2010, Defendant McArthur . . . knowingly used and carried a firearm during and in relation to, and possessed a firearm in furtherance of, a crime of violence." The instruction listing the elements required by § 924(c) likewise directed the jury that a necessary element of the charge was that "on or about August 24, 2010, the defendant, or another person aided and abetted by the defendant, did knowingly use or carry a firearm during and in relation to, or possess a firearm in furtherance of, that crime." And the jury was told that it was considering whether McArthur "aided and abetted in the commission of Count 10." Given that the references to the date of the Raisch shooting focused the jury on the specific firearm use on which Count 10 was premised, there is at least a reasonable dispute about whether the instructions, taken as a whole, fairly and adequately submitted to the jury the "advance knowledge" question. Any error is thus not plain.

-21-

We also conclude that the district court did not err in denying McArthur's motion for judgment of acquittal on Count 10. There was evidence that McArthur wanted to "eliminate [Daniels] by any means," and that he was part of the group that decided to find Daniels and "shoot him." Members involved in those conversations then mistakenly shot into a home in which they believed Daniels was staying; they informed McArthur of the mishap. Days later, members attacked the Raisch residence with Daniels as the target. Based on this evidence, along with testimony concerning the Mob's propensity for firearms and McArthur's decision-making authority as Chief, a reasonable jury could have found him guilty on Count 10.

2.

Having concluded that one of McArthur's convictions should be vacated on the government's request, we must determine the appropriate remedy. The district court sentenced McArthur to a total of 516 months' imprisonment, but 300 months were attributable to the second § 924(c) conviction that will be vacated. The government contends that under the "sentencing package" doctrine, we should vacate McArthur's sentences on all of his convictions and remand for resentencing. McArthur responds that the court should vacate only the sentence for Count 11, and remand with instructions to leave the sentences on his remaining convictions unchanged. Under that approach, McArthur's total sentence would be reduced from 516 months to 216 months' imprisonment.

Under the sentencing package doctrine, we "may vacate the entire sentence on all counts so that, on remand, the trial court can reconfigure the sentencing plan to ensure that it remains adequate to satisfy the sentencing factors in 18 U.S.C. § 3553(a)." *Greenlaw v. United States*, 554 U.S. 237, 253 (2008); *see United States v. Bruguier*, 735 F.3d 754, 764 (8th Cir. 2013) (en banc). The doctrine often arises in cases involving "multicount indictments and a successful attack by a defendant on some but not all of the counts of conviction." *Greenlaw*, 554 U.S. at 253.

-22-

This is an appropriate case for application of the sentencing package doctrine. McArthur was charged in a multicount indictment and convicted of several crimes. He has successfully challenged one of those convictions on appeal. When the district court determined McArthur's sentence on the remaining counts, the court acted on the assumption that he would receive a 300-month consecutive sentence for Count 11. With that sentence vacated, the district court should have an opportunity to decide whether a term of 216 months' imprisonment is sufficient to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). *See United States v. Cureton*, 739 F.3d 1032, 1045 (7th Cir. 2014).

McArthur claims that the sentencing package doctrine applies only when the vacatur of one conviction permits the district court at resentencing to apply a new enhancement under the advisory sentencing guidelines. *See Gardiner v. United States*, 114 F.3d 734, 736 (8th Cir. 1997). But *Gardiner* simply mentioned that possibility as one factor favoring resentencing, and our precedent should not be read as narrowly as McArthur suggests. In *Bruguier*, for example, this court vacated all of the defendant's sentences and remanded for resentencing without purporting to satisfy the limitation that McArthur proposes. 735 F.3d at 764. McArthur also argues that the district court may not alter his sentences on his remaining convictions without violating the Double Jeopardy Clause. A defendant, however, has no expectation of finality in his sentence until an appeal is concluded, and the Double Jeopardy Clause "does not bar resentencing on all counts to carry out the sentencing judge's original intent." *United States v. Evans*, 314 F.3d 329, 333 (8th Cir. 2002).

\*     \*     \*

For the foregoing reasons, we affirm the judgment as to Cree. We affirm Morris's convictions but vacate his sentence and remand for further proceedings. We

-23-

vacate McArthur's conviction on Count 11, affirm his remaining convictions, vacate McArthur's entire sentence, and remand for resentencing.

_____

Appellate Case: 14-3335    Page: 24    Date Filed: 09/08/2016 Entry ID: 4445994