# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-1487
_____

United States of America

*Plaintiff - Appellee*

v.

Wakinyan Wakan McArthur

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: April 12, 2021
Filed: August 25, 2021
[Published]

_____

Before SMITH, Chief Judge, COLLOTON and ERICKSON, Circuit Judges.

_____

PER CURIAM.[1]

_____

[1]Portions of this opinion are taken, without further attribution, from our prior opinion, *United States v. McArthur (McArthur II)*, 784 F. App'x 459 (8th Cir. 2019) (unpublished per curiam).

Wakinyan Wakan McArthur appeals his 420-month sentence for multiple drug and firearm counts. McArthur argues that the district court[2] clearly erred in (1) determining that he was responsible for a drug equivalency of 1,000 to 3,000 kilograms of marijuana, resulting in a base offense level of 30 pursuant to U.S.S.G. § 2D1.1(c)(5); (2) finding that McArthur maintained a premises for manufacturing and distributing a controlled substance ("stash house") under U.S.S.G. § 2D1.1(b)(12); and (3) finding that McArthur committed the offenses as part of a pattern of criminal conduct engaged in as a livelihood under U.S.S.G. § 2D1.1(b)(14)(E) (2014).

I. *Background*

A jury convicted McArthur of criminal offenses stemming from his involvement with the Native Mob, a Minnesota prison-and-street gang. Specifically, the jury convicted McArthur of conspiracy to participate in racketeering activity ("Count 1"); conspiracy to use and carry firearms during and in relation to a crime of violence ("Count 2"); conspiracy to distribute and possess with intent to distribute controlled substances ("Count 7"); and distribution of a controlled substance ("Count 8"). *See* 21 U.S.C. § 841(a), (b); 18 U.S.C. § 2. He was also convicted of two counts of using and carrying a firearm during and in relation to a crime of violence ("Count 10" and "Count 11"). *See* 18 U.S.C. § 924(c). Each of the § 924(c) counts corresponded to two separate acts undertaken as part of the racketeering conspiracy. For Count 10, the district court imposed a mandatory 60-month term of imprisonment. *Id.* § 924(c)(1). For Count 11, the district court imposed a 300-month consecutive sentence. In total, the district court sentenced McArthur to 516 months' imprisonment.

---

[2]The Honorable John R. Tunheim, United States District Judge for the District of Minnesota.

-2-

In his first appeal, McArthur challenged his convictions and sentences on the § 924(c) counts—Counts 10 and 11. We vacated McArthur's conviction on Count 11, affirmed his remaining convictions, vacated his entire sentence, and remanded for resentencing on all the remaining counts under the "sentencing package doctrine." *See United States v. McArthur (McArthur I)*, 850 F.3d 925, 943 (8th Cir. 2017).

On remand, the district court sentenced McArthur to 480 months' imprisonment on the remaining counts of conviction: (1) a 240-month concurrent sentence on Count 1; (2) a 240-month concurrent sentence on Count 2; (3) a 420-month concurrent sentence on Count 7; (4) a 240-month concurrent sentence on Count 8; and (5) a 60-month consecutive sentence on Count 10, the lone remaining § 924(c) count.

In his second direct appeal, McArthur initially argued that the district court erroneously imposed a 480-month sentence by (1) determining that McArthur was responsible for a drug equivalency of 1,000 to 3,000 kilograms of marijuana, resulting in a base offense level of 30 pursuant to U.S.S.G. § 2D1.1(c)(5); (2) finding that McArthur maintained a stash house under U.S.S.G. § 2D1.1(b)(12); and (3) finding that McArthur committed the offenses as part of a pattern of criminal conduct engaged in as a livelihood under U.S.S.G. § 2D1.1(b)(14)(E) (2014). Subsequently, in supplemental briefing, McArthur argued that § 924(c)(3)(B)'s residual clause is unconstitutionally vague. After the Supreme Court held that § 924(c)(3)(B)'s residual clause is indeed unconstitutionally vague, *see United States v. Davis*, 139 S. Ct. 2319 (2019), the government conceded that McArthur's § 924(c) conviction was invalid and must be vacated. We vacated McArthur's conviction on Count 10, vacated his entire sentence under the sentencing package doctrine, and remanded for further proceedings. *See McArthur II*, 784 F. App'x at 461.

Following the second remand for resentencing, a third revised presentence investigation report (PSR) was prepared. McArthur renewed his objections from the

first sentencing proceeding, including his objections to the drug-quantity, stash-house, and criminal-livelihood determinations.

At the third sentencing hearing, the district court again determined that McArthur was responsible for a drug equivalency of 1,000 to 3,000 kilograms of marijuana, maintained a stash house, and committed the offenses as part of a pattern of criminal conduct engaged in as a livelihood. The court incorporated by reference its earlier rulings. The district court had previously ruled that (1) the government proved that the conspiracy included the drug equivalent of between 1,000 and 3,000 kilograms of marijuana;[3] (2) abundant evidence existed that the house at issue was used as a stash house for cutting drugs, storing drugs, and distributing drugs; and (3) McArthur's offenses were part of a pattern of criminal conduct.

It again adopted the PSR and the same total adjusted offense level of 49, capped at 43, and a criminal history category of III. The resulting Guidelines range of life imprisonment was capped at 960 months' imprisonment by operation of the cumulative statutory maximum penalties applicable to the remaining counts of conviction. The district court sentenced McArthur to 420 months' imprisonment.

II. *Discussion*

On appeal, McArthur argues that the district court clearly erred in (1) its drug-quantity calculation; (2) finding that McArthur maintained a stash house under § 2D1.1(b)(12); and (3) finding that McArthur committed the offenses as part of a pattern of criminal conduct engaged in as a livelihood under § 2D1.1(b)(14)(E) (2014).

---

[3]The jury found McArthur responsible for the distribution of less than 500 grams of cocaine and 28 grams or more but less than 280 grams of cocaine base. The district court determined that McArthur was responsible for 1,000 to 3,000 kilograms of marijuana. The equivalent quantity of cocaine base is at least 280 but less than 840 grams. *See* U.S.S.G. § 2D1.1(c)(5) (drug quantity table).

-4-

A. *Drug Quantity*

McArthur first argues that the district court clearly erred in finding him "responsible for the greatest amount of drugs that could still be consistent with the jury's findings: 499 grams of cocaine and 279 grams of cocaine base," which is the drug equivalent of "between 1,000 and 3,000 kg of marijuana." Appellant's Br. at 20. Specifically, he asserts that "little evidence" exists showing that he "was involved in the sale of cocaine or cocaine base in quantities beyond the minimum under the jury's findings." *Id.* at 21. According to McArthur, his coconspirator, Christopher Wuori, "was involved in greater weights of cocaine," and McArthur was not connected to most of Wuori's drug activity. *Id.* McArthur maintains he was present only for "some of this activity . . . and was directly involved in some sales for small amounts of cocaine." *Id.*

At sentencing, "[t]he government bears the burden of proving drug quantity by a preponderance of the evidence." *United States v. Sainz Navarrete*, 955 F.3d 713, 720 (8th Cir. 2020) (quoting *United States v. Plancarte-Vazquez*, 450 F.3d 848, 852 (8th Cir. 2006)). On appeal, "[w]e review [a district court's drug-quantity finding] for clear error and reverse only when 'the entire record definitely and firmly illustrates that the lower court made a mistake.'" *Id.* (quoting *United States v. Marshall*, 411 F.3d 891, 894 (8th Cir. 2005)).

> For purposes of calculating drug quantity in a drug conspiracy case, the district court may consider amounts from drug transactions in which the defendant was not directly involved if those dealings were part of the same course of conduct or scheme. This includes all transactions known or reasonably foreseeable to the defendant that were made in furtherance of the conspiracy.

*United States v. Lewis*, 976 F.3d 787, 797 (8th Cir. 2020) (cleaned up); *see also United States v. Washington*, 968 F.3d 860, 865 (8th Cir. 2020) ("In the context of a conspiracy, the drug quantity for sentencing purposes includes not only quantities

-5-

[the defendant] was personally involved with, but 'all quantities of contraband that were involved in transactions carried out by other participants, if those transactions were within the scope of, and in furtherance of, the jointly undertaken criminal activity and were reasonably foreseeable in connection with that criminal activity.'" (quoting U.S.S.G. § 1B1.3 cmt. n.3(D))).

"It is well-established that the testimony of co-conspirators may be sufficiently reliable evidence upon which the court may base its drug quantity calculation for sentencing purposes." *Plancarte-Vazquez*, 450 F.3d at 852; *see also United States v. Sarabia-Martinez*, 276 F.3d 447, 450 (8th Cir. 2002) ("A sentencing court may determine drug quantity based on the testimony of a co-conspirator alone."). "[I]t is [also] well established that in sentencing matters a district court's assessment of witness credibility is quintessentially a judgment call and virtually unassailable on appeal." *United States v. Rodriguez*, 711 F.3d 928, 938 (8th Cir. 2013) (quotation omitted). A "district court may rely on trial testimony to determine drug quantity." *United States v. Janis*, 995 F.3d 647, 652 (8th Cir. 2021) (citing *United States v. Young*, 689 F.3d 941, 945 (8th Cir. 2012)).

We hold that the district court did not clearly err in finding a drug quantity of between 1,000 and 3,000 kilograms of marijuana. The district court was entitled to rely on the trial testimony of McArthur's coconspirators, including Dale Pindegayosh, Kenny Roberts, Dwight Jones, Randy Seelye, and Justin Hollins, in determining the drug-quantity amount. Their testimony was more than sufficient to support the district court's finding of a drug quantity between 1,000 and 3,000 kilograms of marijuana. First, Pindegayosh testified that McArthur and Wuori "pooled their money together" on the drugs. Trial Tr. vol. XXIV, at 137, *United States v. McArthur*, No. 0:12-cr-00026-JRT-JSM (D. Minn. 2015), ECF No. 1506. According to Pindegayosh, he made drug runs to Minneapolis with McArthur and Wuori to purchase cocaine. During the drug conspiracy, Pindegayosh estimated making 15 drug runs to pick up cocaine. The quantities of cocaine ranged from 255.15 grams to one kilogram of

Appellate Case: 20-1487   Page: 6   Date Filed: 08/25/2021 Entry ID: 5069164

cocaine. The cocaine base equivalent is 14.29 grams, while the marijuana equivalent is 51.03 kilograms. *See* U.S.S.G. § 2D1.1 cmt. n.8(D). Fifteen trips at 255.15 grams per trip generates a cocaine base equivalent of 214.34 grams and a marijuana equivalent of 765.45 kilograms. Pindegayosh also testified the cocaine was often brought to the "White House" where McArthur and Wuori resided. There, Wuori cooked the cocaine into cocaine base. Pindegayosh estimated that between 2010 and early 2012, he obtained three to four pounds—1,360.78 to 1,814.37 grams—of cocaine base from Wuori; 1,360.78 grams of cocaine base has a drug equivalency of 4,859.35 kilograms of marijuana. *See id.* According to Pindegayosh, he sold these drugs in smaller quantities of half-grams, grams, 3.5 grams, and 14 grams.

Roberts testified that, during the conspiracy, McArthur asked him to store nine ounces (255.15 grams) of cocaine at Roberts's mother's house; 255.15 grams of cocaine has a drug equivalency of 51.03 kilograms of marijuana. *See id.* On one occasion, McArthur removed 28 grams of cocaine base out of a closet at the White House and sold it to Roberts's associate. This 28-gram purchase of cocaine base has a drug equivalency of 99.99 kilograms of marijuana. *See* U.S.S.G. § 2D1.1 cmt. n.8(D). Additionally, Roberts testified that from 2009 to 2010, McArthur and Wuori supplied cocaine base to him more than ten times in quantities ranging from 3.5 to 28 grams. Using the smallest quantity amount, McArthur and Wuori supplied Roberts with 35 grams of cocaine base, which has a drug equivalency of 124.99 kilograms of marijuana. *See id.* Roberts also saw McArthur and Wuori supply another associate, David Bowie, with 7 grams of cocaine base in 2009.

Jones testified that McArthur and Wuori supplied him with cocaine base between 2009 and 2010. On one occasion, Jones witnessed Wuori hand approximately 56 grams of cocaine base—which has a drug equivalency of 199.98 kilograms of marijuana—to McArthur at the White House.

Seelye testified that he, McArthur, and other Native Mob members pooled their money to purchase cocaine in 2009. Then, in 2011 while working for law enforcement, Seelye bought 3.6 grams of cocaine base directly from McArthur and Wuori and 6 grams from Wuori at the White House a short time thereafter.

Based on this ample evidence, we hold that the district court's drug-quantity determination holding McArthur responsible for 1,000 to 3,000 kilograms of marijuana was not clearly erroneous.

B. *Stash House*

McArthur asserts that the district court clearly erred in applying the stash-house enhancement, U.S.S.G. § 2D1.1(b)(12), to him because he did not maintain the residence. He argues that because he did not maintain the house, any drug activity occurring while he stayed in the residence was only incidental to the residence's primary use as a dwelling. According to McArthur, (1) Wuori maintained the White House, not McArthur; (2) the substantial drug trafficking that may have occurred at the White House happened when Wuori lived there and maintained the premises, not McArthur; and (3) the incidental use of the White House for others to distribute narcotics is insufficient to show that the manufacturing or distribution of narcotics was one of McArthur's primary uses of the residence.

We review for clear error the district court's factual finding that a defendant maintained a stash house. *United States v. Garcia*, 774 F.3d 472, 475 (8th Cir. 2014) (per curiam).

"Subsection (b)(12) applies to a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution." U.S.S.G. § 2D1.1 cmt. n.17. "This enhancement 'applies when a defendant uses the premises for the purpose of substantial drug-trafficking

-8-

activities, even if the premises' also served other, legitimate, functions." *United States v. Anwar*, 880 F.3d 958, 971 (8th Cir. 2018) (quoting *United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012)).

To determine whether a defendant "maintained" a premises as a stash house, "[a]mong the factors the court should consider . . . are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises." U.S.S.G. § 2D1.1 cmt. n.17. But "[h]olding title to the premises is not required for purposes of this section." *Anwar*, 880 F.3d at 971. "Where the defendant lives in the house, this element is normally easily proved." *Miller*, 698 F.3d at 706 (quoting *United States v. Verners*, 53 F.3d 291, 296 (10th Cir. 1995)).

To determine whether the premises was primarily or principally used as a stash house, "the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." U.S.S.G. § 2D1.1 cmt. n.17. "Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises." *Id.* "We [have] assume[d] that § 2D1.1(b)(12) . . . requires proof that the specific defendant being sentenced maintained the premises 'for the purpose of' drug manufacturing or distribution. 'It is not sufficient that others possess the requisite purpose.'" *Miller*, 698 F.3d at 706 (quoting *United States v. Payton*, 636 F.3d 1027, 1043 (8th Cir. 2011)). But "drug manufacturing or distribution need only be 'one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises.'" *Id.* (quoting U.S.S.G. § 2D1.1 cmt. n. 28 (2012)).[4]

---

[4] Application Note 28 is now Application Note 17.

We hold that the district court did not clearly err in applying the stash-house enhancement. McArthur does not contest that the White House was his residence for a period of time. *See* Appellant's Br. at 26. And "McArthur does not dispute that the evidence shows that at various points in time the '[W]hite [H]ouse' . . . was used to manufacture or distribute controlled substances." *Id.* Instead, McArthur argues that "Wuori maintained the '[W]hite [H]ouse.'" *Id.* The evidence, however, shows that McArthur also maintained the White House. First, the evidence established that McArthur *and* Wuori used the White House for cooking cocaine into cocaine base, as well as for packaging and distributing drugs. Jones, Roberts, Seelye, Pindegayosh, and Bear Conway all testified about Wuori's and McArthur's use of the White House to store narcotics and Wuori's use of the home to cook the powder cocaine into cocaine base. Testimony also showed that McArthur and Wuori used the White House to discuss with other Native Mob members the shooting of a rival drug dealer. The witnesses testified that several Native Mob members frequented the home and that firearms were often present. A drug-trafficking expert testified that firearms are commonly used by those involved in drug trafficking for protection.

Second, McArthur's own statements show that he encouraged members of Native Mob to use his residence to prepare drugs for distribution. Specifically, McArthur was recorded, stating, "I got a crib. N****rs could stay in my crib, they can f***in' cut their sh*t up n****r. If they bring any dope in the crib though, in my house, and the—and the cops come in, they gotta take the rap for that, you know what I'm saying? Don't—don't put it off on me, our—(inaudible) we'll put you on your feet n****r, you know what I'm saying . . . ." PSR at 82, ¶ 269, *United States v. McArthur*, No. 0:12-cr-00026-JRT-JSM (D. Minn. 2019), ECF No. 1954. In responding to a series of questions about the execution of a search warrant at the White House, McArthur admitted at trial that a "host of people" would know that he stored distribution quantities of marijuana at this residence. Trial Tr. vol. XXVI, at 131, *United States v. McArthur*, No. 0:12-cr-00026-JRT-JSM (D. Minn. 2015), ECF No. 1542.

C. *Pattern of Criminal Conduct Engaged in as a Livelihood*

McArthur also argues the district court clearly erred in finding that he committed the offenses as part of a pattern of criminal conduct engaged in as a livelihood under U.S.S.G. § 2D1.1(b)(14)(E) (2014).

We review for clear error a district court's factual findings regarding the criminal-livelihood enhancement. *Sainz Navarrete*, 955 F.3d at 721.

Under the criminal-livelihood enhancement, a two-level increase applies if "the defendant receives an adjustment under § 3B1.1" and "the defendant committed the offense as part of a pattern of criminal conduct engaged in as a livelihood." U.S.S.G. § 2D1.1(b)(14)(E) (2014). Application Note 19(C) of § 2D1.1 (2014) directs that "'pattern of criminal conduct' and 'engaged in as a livelihood' have the meaning given such terms in § 4B1.3 (Criminal Livelihood)." In turn, Application Note 1 of § 4B1.3 (2014) provides that "'[p]attern of criminal conduct' means planned criminal acts occurring over a substantial period of time.'" That note also defines "[e]ngaged in as a livelihood" as "(A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; and (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period." U.S.S.G. § 4B1.3 cmt. n.2 (2014).

"Even if one accepts for the sake of argument that [he] engaged in a pattern of criminal conduct," McArthur argues, "the evidence did not show that such conduct was 'engaged in as a livelihood.'" Appellant's Br. at 30.

The criminal-livelihood enhancement "applies if a defendant derives income in any twelve-month period that exceeds '2,000 times the then existing hourly minimum wage under federal law.'" *Sainz Navarrette*, 955 F.3d at 721 (emphasis

-11-

omitted) (quoting U.S.S.G. § 4B1.3 cmt. n.2). "At the time of [McArthur's] offense, the hourly minimum wage was $7.25." *Id.* (citing 29 U.S.C. § 206(a)). As a result, the government had to "show that [McArthur] derived more than $14,500 in income from his drug activity to prove that the enhancement applied." *Id.* at 722.

We hold that the district court did not clearly err in applying the criminal-livelihood enhancement. First, according to the PSR, McArthur had a reported income of $2,406 and $17,966 in 2008 and 2009, respectively. And it stated that McArthur failed to file a tax return from 2008 to 2012. McArthur reported to probation that he had no assets and no liabilities, and a credit report revealed no credit history. When asked about his legitimate income, McArthur stated he briefly held a job, but he lost it when he violated his parole and was sent back to state prison. He also testified that he bought clothes, jewelry, and traveled with the proceeds from drug sales. He admitted to using the money earned from selling marijuana to purchase equipment to create his recording studio.

Second, the trial evidence showed that McArthur and Wuori charged between $46 and $71 per gram for cocaine base. Specifically, McArthur charged $250 for 3.6 grams of cocaine base—$71 per gram. But the price dropped to $46 per gram when McArthur sold the cocaine base in larger quantities.

The district court was entitled to draw reasonable inferences from the record that McArthur derived more than $14,500 in income from his drug activity. *See United States v. Hawkins*, 866 F.3d 344, 349 (5th Cir. 2017). As set forth above, McArthur's relevant conduct supports a drug-quantity finding of approximately 2,000 grams of cocaine base. McArthur's untaxed income from cocaine base alone ranged from $92,000 to $140,000. If we divide these figures by the three years that McArthur was not in prison—February 2009 through arrest date of February 2, 2012—the resulting average income is between $30,600 and $46,600 per year. The resulting figures are in excess of $14,500 (2,000 x $7.25), even considering an equal split of

the proceeds with Wuori ($15,300 to $23,300). These estimates exclude the income generated by McArthur's sales of pills, cocaine, heroin, and any other illegal drugs. And McArthur himself testified that he made money following release from prison by selling over 100 pounds of marijuana.

III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____